LAW OFFICES OF HUMBERTO DIAZ
HUMBERTO DIAZ (No 157692)
(E-mail:  JHDiazLaw@gmail.com)
714 West Olympic Blvd., Suite 610
Los Angeles, CA   90015
Telephone (213) 745-7477
Facsimile  (213) 745-7447

Attorneys for Defendant
JOSE VILLEGAS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR-18-0250-CJC-4 |
| Plaintiff, | DEFENDANT JOSE VILLEGAS' SENTENCING POSITION PAPER; EXHIBITS |
| v. | |
| JOSE VILLEGAS, | |
| Defendant. | |

Defendant Jose Villegas, through counsel, hereby files the present Position Paper for the Court's consideration.

The defense urges the Court to impose a sentence consistent with a conviction with the charges of conviction, namely a sentence of 120 months.

//

Also enclosed for the Court's consideration and the following letters:

Exhibit A:   Defendant's Letter to the Court.

Exhibit B:   Letter to the Court from defendant's mother.

Respectfully submitted,

DATED: February 10, 2024        By  */s/ Humberto Diaz*
                                HUMBERTO DIAZ

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Mr. Villegas is a 42-year-old young man with limited criminal history until 2010, when he was arrested with one pound of methamphetamine and received a 12-year federal sentence.  While serving that sentence, and due in part to the circumstances surrounding our prison system, the present case came to be.

The defense has long contended that while defendant did not intend to kill anyone, his actions did contribute to the death of a human being and this defendant has accepted responsibility for his actions.  All defendants tried to resolve the case by admitting responsibility for second degree murder, but disputed that their conduct amounted to first degree murder. The defendants essentially pled guilty to second degree murder and the jury agreed that their conduct amounted to second degree murder and acquitted all defendants of the first degree murder charges.

The Guideline calculations account for defendant's criminal history as well as for the characteristics of the offense.  There is no principled reason to impose a sentence in this case longer than a guideline sentence that results from the application of the second degree murder guidelines.

**II.**

**OBJECTIONS TO THE PSR**

<u>Front Page of PSR</u>

The PSR front page lists the conviction of Count Two as "Conspiracy to Murder".  This should be corrected to indicate that defendants pled to

3

"Conspiracy to Commit **Second Degree** Murder".  *See* CR 408.

PSR ¶ 21

The Probation Offices notes that "Villegas kept kicking J.S. in the face and chest".  PSR ¶ 21.  This is not correct.  The testimony at trial was that Mr. Villegas kicked the victim, without boots, and kicked only the victim's lower extremities.  *See also* Government's Sentencing Position at 25, CR 583.

A. Offense Level Computation

1.  The Appropriate Guideline is the Second Degree Murder Guideline

The issue in this case has always been whether defendants should be held responsible for a first degree murder or a second degree murder.  First degree murder carries a mandatory life sentence and therefore the highest Guideline offense level, 43, while second degree murder has a base offense level 38.  *See* U.S.S.G. §§ 2A1.1(a), 2A1.2(a).

Given that this defendant was found guilty of conduct amounting to second degree murder culpability it only makes sense to apply the second degree murder Guidelines.  Both the Probation Office and the Government rely on the "Conspiracy to Commit Murder" guideline, §2A1.5(c)(1), to conclude that a conspiracy to commit second degree murder should be based on the first degree murder guidelines.  *See* PSR ¶33(b); Government's at 7.  The defense disagrees, and contends that the "conspiracy to commit murder" guideline does **not** cover a "conspiracy to commit **second degree** murder" conviction.

Because a conspiracy to commit second degree murder is not specifically covered by any guidelines, the appropriate guideline to use is

U.S.S.G. §2X1.1 ("Conspiracy Not Covered by a Specific Offense Guideline"). Under this guideline, the base offense level is calculated as follows:

> The base offense level from the guideline **for the substantive offense**, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.

U.S.S.G. §2X1.1(a) (emphasis added).  Given that the guidelines provide an unequivocal offense level for second degree murder under U.S.S.G. §2A1.2(a), that is clearly the guideline to be used in this case.

### 2.  Acceptance of responsibility

Even though defendants pled guilty to conspiracy to commit second degree murder, the Probation Officer is recommending that no adjustment for acceptance of responsibility be applied, under the rationale that "the Probation Officer is not aware of any Constitutional issues unrelated to factual guilt that Villegas was attempting to preserve by going to trial on Count 1."  PSR ¶ 46.  The defendants proceeded to trial on Count One because the facts of the case did not warrant a first degree murder conviction and because a first degree murder conviction carries a mandatory life sentence.  The defense agrees with the Government that defendants are eligible for a reduction in the offense level on account of acceptance of responsibility. *See* Government's at 10-11.

### 3.  Role in the offense

The Probation Officer is not recommending an adjustment in Mr. Villegas' offense level on account of his participation.  PSR ¶ 40.  However, the Probation Office states that "[it] does not appear that Villegas directed or controlled the conduct of other participants in the scheme." *Id.*  The

Guidelines provide for a two-level reduction in the offense level if a defendant is a "minor participant". U.S.S.G.§ 3B.1.2(b). Mr. Villegas' participation in this offense warrants such a reduction. As acknowledged by the Government, Mr. Villegas is responsible "to a lesser degree" than his codefendants. Government's at 24. Mr. Villegas was not wearing boots at the time of the assault, PSR ¶ 15, and he was striking the victim's lower extremities. *See* PSR ¶ 17, *see also* Government's at 24.

### B. Criminal History

#### 1. Paragraph 59

The Probation Office is assessing two extra points to Mr. Villegas on account of him being "under a criminal justice sentence". PSR ¶ 59. As noted in the Government's position paper, this enhancement is no longer applicable under the current Guidelines. *See* Government's at 14.

#### 2. Overrepresentation of Criminal History

A mechanical application of the Guidelines places this defendant at Criminal History Category III, but the defense contends that this category overrepresents Mr. Villegas' prior criminal history. This defendant has a single prior conviction that resulted in a prison sentence for an offense that took place in 2010. PSR ¶ 56. However, Mr. Villegas is also receiving two criminal history points, for offenses that took place in 2002 and 2003, over 20 years ago. *See* PSR ¶¶ 51, 52. The defense contends that Mr. Villegas' criminal history calculation is overrepresented. The Guidelines provide that a downward departure may be warranted if "defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history". U.S.S.G. §4A.1.3(b) (Policy Statement).

6

The defense therefore contends that Category II is the appropriate criminal history category for Mr. Villegas and that it is inherently unfair to increase defendant's criminal history as calculated by the Probation Office.

## III.

## THE RECOMMENDED SENTENCE OF 120 MONTHS IS APPROPRIATE UNDER THE GUIDELINES AND UNDER §3553(a) FACTORS

### A. History and Characteristics of Defendant

Mr. Villegas has accepted responsibility for his participation in the assault of a fellow inmate that resulted in the inmate's death.  Mr. Villegas was brought to this country as a child, illegally, and remains undocumented to this day.  PSR ¶ 64.  Although he came to the United States when he was only 8 years old, he struggled with the English language.  As noted by the Probation Officer:

> Villegas found the transition difficult as he did not speak English and was "bullied" in school as the children would "[make] fun of the way [he] spoke." These "bullies" were dual-language children.

PSR ¶ 70.

Even if he was raised in the inner city of Los Angeles, this defendant never fully became comfortable in an English-speaking world.  Sadly, with time he also lost his confidence in his ability to fully function in a Spanish-speaking environment and gave up with school after the 11th grade.  PSR ¶92.  Mr. Villegas began working after he left school, but unfortunately by this time he already had a problem with alcohol, later began to use cocaine

7

and became a methamphetamine addict. PSR ¶ 86-90. *See also* Exhibit A, defendant's letter to the Court.[1]

The Government is requesting a life sentence for this defendant in part due to Mr. Villegas' history. Government's at 24. The defense disagrees, and submits that Mr. Villegas' history, including his conduct before and after the assault, does not warrant the sentence recommended by the Government.

Before Mr. Villegas was sentenced to federal prison, he suffered convictions for traffic offenses and possession of narcotics for which he received probationary sentences. PSR ¶¶ 51, 52, 53. These convictions are consistent with a young person from a troubled background with a drug problem, but do not indicate this that defendant is a violent person who deserves to spend the rest of his life in prison.

The federal case for which Mr. Villegas received a sentence of 144 months did not involve a "large methamphetamine deal", as described in the prosecution. *See* Government's paper at 24. Mr. Villegas received this very draconian sentence for an offense that involved just over one pound of methamphetamine. *Id.*

The only thing that the Government can point out that Mr. Villegas was involved in while incarcerated, besides the present offense, is the allegation of a relatively minor assault in 2013, *see* Government's at 25, and as to that assault, the prison investigators concluded that "there is insufficient evidence to hold anyone accountable for this assault". *See* Government's position paper, Exhibit 15, CR-583-11 at 6. Certainly Mr.

---

[1] Defendant chose to write his letter to the Court in Spanish. However, he did not use an interpreter at trial and is not requesting the assistance of an interpreter.

Villegas' conduct while in prison does not justify the life sentence recommendation by the Government.

When Mr. Villegas first got to federal prison he had an important decision to make, as explained repeatedly at trial: He could have chosen to "run" with the *paisas*, or with the Southsiders. As a Spanish-speaking undocumented inmate, Mr. Villegas could have chosen "to be" a *paisa*. However, he chose to be a Southsider. Once he made that decision he had to serve his long sentence under the harsh rules of the prison system.

Just like he was "bullied" while he was in school, Mr. Villegas found himself under the merciless bullying of the prison culture, but while in school he was able to eventually just drop out of school and face life on his own, as a federal inmate he did not have the choice of just "dropping out." This is a difficult situation for any inmate, and a particularly difficult situation for an inmate who did not find his fit in life, either in or out of prison.

The Government's reliance on this defendant's tattoos for requesting a harsh sentence is particularly puzzling. At trial, the prison expert opined that anybody who has an "LA" tattoo is a Southsider, a plainly ridiculous argument in Southern California, where thousands, if not millions of people have those tattoos. The Government's assertion that because defendant has a jaguar tattoo and a L.A. Raiders tattoo he is a soldier is similarly misplaced. *See* Government's at 25. The bald assertion that "The **Jaguar** tattoo is "earned". You see only certain inmates can wear a **Jaguar**", *see* Govt. Exhibit 17; CR 583-13 at 1 (emphasis in the original) is inaccurate, misleading, and completely irrelevant when we take into consideration that this particular defendant had all these tattoos **before** he went to prison.

9

To base a recommendation for a life sentence in part on tattoos that a defendant already had, before he ever went to prison, is simply not justified.

Mr. Villegas is fortunate to still enjoy the full support and love of his mother. *See* Exhibit B, defendant's mother letter to the Court. He is going to face a mandatory deportation after he completes his sentence and will be returned to Mexico, a country that he does not really know. He is again going to find himself at a place where he will not fit in and will again be under tremendous pressures. But his father and brother are in Mexico, and with his mother's help he can hope to be able to remake his life in his native country.

## IV.
## SENTENCING RECOMMENDATION

For all the forgoing reasons, the defense respectfully requests that the Court impose a sentence of 120 months. This recommendation is consistent with the application of the Guidelines and the background of this young defendant.

The defense submits that this sentence provides plenty of punishment for the offense charged and that there is no sentencing goal to be advanced by imposing a longer sentence on this particular defendant.

//

Mr. Villegas also requests from the Court a recommendation that he be allowed to participate in the BOP's 500-hour Drug Treatment Program, so he can get help to make sure he remains drug-free after he is released from custody.

Respectfully submitted,

Date: February 10, 2024        By  / s/ *Humberto Diaz*
                                   HUMBERTO DIAZ

11